**EGERIA, SOCIETA di NAVIGAZIONE PER AZIONI, a body corporate**

**v.**

**The ORINOCO MINING COMPANY, a body corporate.**

**Civ. No. 70–1465-K.**

United States District Court,
D. Maryland.

June 12, 1973.

998

James B. Carson, Baltimore, Md., for plaintiff.

Paul V. Niemeyer, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

This case involves questions concerning the reach of a rather recent—1971—amendment to the Maryland Long Arm Statute, Md.Ann.Code art. 75, § 96(a)(4) (1969 Repl.Vol., 1972 Cum. Supp.), concerning which, as far as this Court is informed, no Maryland court has yet spoken.[1] The undisputed facts disclose that on December 6, 1970, the S. S. Sorrento, a freighter owned by plaintiff, ran aground in the Orinoco River in Venezuela as she was leaving the port of Palua in that country bound for Baltimore, Maryland with a cargo of iron ore.[2] The iron ore on board the Sorrento had neither been mined nor shipped by defendant Orinoco, a subsidiary of United States Steel Corporation, but rather by a subsidiary of Bethlehem Steel Corporation. The ore had also been loaded at a facility in Palua other than that of the defendant Orinoco. The ship remained fast aground until part of her cargo was off-loaded and tug boats pulled her free.[3] She then[4] proceeded to Baltimore where the remaining iron ore was delivered to the Bethlehem Steel plant at Sparrows Point.[5] On December 29, 1970, the Sorrento's owners filed suit in this Court alleging that the defendant Orinoco, its employees and agents negligently dredged, maintained and measured the depth of the ship channel in the Palua harbor and negligently cleared the ship for passage after loading, when they knew or should have known that the channel was not deep enough for the ship to pass through as so loaded. Plaintiff seeks $5,000,000 for damage to the ship, the cost of pulling the ship free, and loss of potential revenue from the operation of the ship during the time the latter was unable to operate in commerce.

Subject matter jurisdiction exists under 28 U.S.C. § 1333(1). In addition, there is diversity of citizenship between plaintiff, an Italian corporation, and defendant, a Delaware corporation with its principal place of business in Delaware. 28 U.S.C. § 1332(a)·(2). Defendant has, however, moved pursuant to Federal Civil Rule 12(b)(2) to dismiss the complaint for lack of jurisdiction over the person of the defendant. Plaintiff, responding, contends that under Federal Civil Rule 4(e)(1), section 96(a)(4) of article 75 of the Annotated Code of Maryland, 1969, Replacement Volume 1971, lodges jurisdiction in this Court over the person of defendant.[6] That section provides in pertinent part:

(a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's

\* \* \* \* \* \*

(4) Causing tortious injury *in this State or outside of this State by an act or omission outside the State* if he regularly does or solicits business, engages in any other persistent course of conduct in this State or derives substantial revenue from goods, food, services or manufactured products

1. The amendment involved herein became effective on July 1, 1971.

2. 52,999 long tons.

3. 8,558 long tons were off-loaded.

4. The grounding of the ship and the off-loading caused a 12-day delay.

5. 44,441 long tons.

6. Plaintiff also alleges that service has been effected in this case upon an alleged agent of the defendant. The evidence fails by a large margin to establish such agency.

used or consumed in this State; * * *. [Emphasis added.]

Before its amendment, effective July 1, 1971, that section did not include the words "or outside of this State."[7]

In order for plaintiff successfully to rely upon article 75, § 96(a)(4) as a means of calling the defendant Orinoco to appear in this Court, plaintiff must satisfy the two-pronged test set out by Judge Goodrich in Pulson v. American Rolling Mill Co., 170 F.2d 193 (1st Cir. 1948). In that case, Judge Goodrich wrote (at 194):

There are two parts to the question whether a foreign corporation can be held subject to suit within a state. The first is a question of state law: has the state provided for bringing the foreign corporation into its courts under the circumstances of the case presented? There is nothing to compel a state to exercise jurisdiction over a foreign corporation unless it chooses to do so, and the extent to which it so chooses is a matter for the law of the state as made by its legislature. If the state has purported to exercise jurisdiction over the foreign corporation, then the question may arise whether such attempt violates the due process clause or the interstate commerce clause of the federal constitution. Const. art. 1, § 8, cl. 3; Amend. 14. This is a federal question and, of course, the state authorities are not controlling. But it is a question which is not reached for decision until it is found that the State statute is broad enough to assert jurisdiction over the defendant in a particular situation. [Footnote omitted.]

The first prong of Judge Goodrich's analysis, i. e., "has the state provided for bringing the foreign corporation into its courts under the circumstances of the case presented", involves, in this case, the threshold question of whether the 1971 amendment to section 96(a)(4) applies retrospectively.[8] The alleged tort occurred on December 6, 1970, this suit was filed on December 29, 1970, and the 1971 amendment became effective on July 1, 1971. The statute itself gives no clue to the answer. However, substantially similar procedural, changes enacted by statute and expanding personal jurisdiction of state courts have been given retrospec-

7. Md.Ann.Code art. 75, § 96 (1969 Repl. Vol., 1972 Cum.Supp.) reads in toto:
(a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's
(1) Transacting any business in this State;
(2) Contracting to supply goods, food, services or manufactured products in this State;
(3) Causing tortious injury in this State by an act or omission in this State;
(4) Causing tortious injury in this State or outside of this State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in this State or derives substantial revenue from goods, food, services or manufactured products used or consumed in this State;
(5) Having an interest in, using, or possessing real property in this State; or

(6) Contracting to insure or act as surety for, or on, any person, property, or risk, contract, obligation, or agreement located, executed or to be performed within this State at the time of contracting, unless the parties otherwise provide in writing.
(b) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.
[The words added by the 1971 amendment are emphasized].

8. Prior to its amendment in 1971, section 96(a)(4) was premised upon a defendant's "[c]ausing tortious injury in this State by an act or omission outside the State * * *." No tortious injury within the State of Maryland is alleged to have occurred in the complaint herein. Thus, absent the amendment to section 96(a)(4) adding the phrase "or outside of this State", no contention that Maryland would assert jurisdiction would have merit.

tive effect. Liberty Mutual Ins. Co. v. American Pecco Corp., 334 F.Supp. 522 (D.D.C.1971); Hardy v. Rekab, Inc., 266 F.Supp. 508, 513–517 (D.Md.1967), in which (at 515) the Supreme Court of Illinois in Nelson v. Miller, 11 Ill.2d 378, 382, 143 N.E.2d 673, 676 (1957), is quoted as stating that the Illinois Long Arm Statute is retroactively applicable "without regard to whether [the cause of action] accrued before or after such change of law and without regard to whether the suit has been instituted or not, unless there is a saving clause as to existing litigation." Accordingly, the 1971 amendment will be retrospectively applied in this case.

Orinoco is a wholly owned subsidiary of United States Steel Corporation, with its principal place of business, and with an agent for service of process, in its state of incorporation, Delaware. Iron ore mined by Orinoco in Venezuela is sold to U. S. Steel F.O.B. Palua, Venezuela and then shipped in vessels owned by a subsidiary of U. S. Steel to U. S. Steel plants at Morrisville, Pennsylvania and Mobile, Alabama. Occasionally, when the port facilities in Pennsylvania are too congested, those ships are diverted to Baltimore where the subsidiary arranges with contractors to store the iron ore until it can be shipped by rail to Saxonburg, Pennsylvania or Morrisville, Pennsylvania. Approximately ten to twelve such shipments of iron ore pass through Baltimore every year.[9] In the past, Orinoco has also sold iron ore to a subsidiary of Bethlehem Steel. Those sales have taken place in Venezuela and the iron ore so sold has then been shipped by such subsidiary to Bethlehem Steel's plant at Sparrows Point in Baltimore. However, there were no sales of iron ore from Orinoco to that Bethlehem Steel subsidiary during 1970 or during the several years preceding 1970.

That subsidiary of Bethlehem Steel also mines its own iron ore in Venezuela, and, as was done in this case, loads that ore at its own facilities in Palua harbor onto vessels owned by others, in this case by plaintiff, destined for Sparrows Point or other Bethlehem Steel plants in the U. S. A.

All ships leaving the port of Palua sail down a channel in the Orinoco River owned by the Venezuelan Government. That channel, and all aids to navigation along that channel, are maintained by Orinoco under contract with the Venezuelan Government.

Orinoco has never had a resident agent in Maryland, never been qualified to do business, nor in fact done any business, in Maryland in any form, never owned real property located in Maryland, and has never advertised, solicited sales, or maintained telephone listings or bank accounts in Maryland. However, iron ore mined by Orinoco does pass through Maryland enroute to its final destination,[10] and some of Orinoco's ore has been sold to and processed in the past in Maryland by Bethlehem Steel. Additionally, plaintiff asks this Court to take judicial notice of the fact that many finished products, manufactured outside of Maryland but ultimately used in Maryland, are made from steel which itself was made from Orinoco ore.[11] Plaintiff contends that, in the words of present section 96(a)(4) Orinoco "derives substantial revenue from . . . manufactured products used or consumed" in Maryland and for that reason can be served within the newly expanded coverage of Maryland's Long Arm Stat-

9. In 1971 eight such shipments were diverted to Baltimore and in 1970 twelve vessels arrived in that port with iron ore from Orinoco. Each shipment of iron ore is valued at $200,000 or more. Thus, Orinoco has shipped approximately between $1,600,000 and $2,400,000 worth of iron ore to the State of Maryland from Venezuela in each of those said two years. However, all of such shipments were originally destined for Morrisville, Pennsylvania and merely stored in Maryland.

10. See n. 9 supra.

11. For purposes of this opinion, this Court takes such judicial notice.

ute, even though both the alleged negligent act and the injury occurred in Venezuela.

The issue is thus posed as to whether the extended reach provided by the 1971 amendment to Maryland's Long Arm Statute was intended to reach a defendant whose sole contact with Maryland is by deriving substantial revenue from the sale of goods within the State regardless of whether that defendant regularly does or solicits business within Maryland and regardless of whether the cause of action is connected with such derivation of revenue. The preamble to that amendment [12] does indicate that perhaps the General Assembly intended to extend the personal jurisdiction of the Maryland courts *only* to a defendant who causes injury outside Maryland by acts occurring outside the State when the defendant has regularly been doing business in Maryland. Under that reading of the statute, Orinoco would not be within its reach. Plaintiff does not contend, and indeed there is no evidence

whatsoever, that Orinoco is regularly doing business in Maryland. However, the plain words of the statute itself, as amended, indicate a broader alternative tripartite extension of coverage to: (1) those regularly doing or soliciting business in Maryland; *or* (2) those engaging "in any other persistent course of conduct in" Maryland; *or* (3) those deriving substantial revenue from the sale of manufactured products within the State. As indicated above, plaintiff does not contend that Orinoco is either "regularly doing or soliciting business in Maryland". Nor does plaintiff contend that Orinoco has engaged "in any other persistent course of conduct in" Maryland. Thus plaintiff's sole contention is that Orinoco has "derive[d] substantial revenue from goods, food, services, or manufactured products used or consumed" in Maryland.

No Maryland or federal case has been cited to, or discovered by, this Court which fixes the parameters of "substantial revenue" as those words are used in

12. Whereas, In 1964, as amended in 1970, by the General Assembly, the bases of personal jurisdiction over persons outside this State were expanded by the enactment of Article 75, Sections 94, 95 and 96 as supplementary to any law of this State providing for personal jurisdiction over persons outside this State and nothing contained in Article 75 shall repeal or modify any law of this State authorizing the exercise of jurisdiction on any basis other than the basis provided herein as set out in Section 2 of Ch. 95, Acts 1964.

The law governing suits against foreign corporations in 1964 at the time of the passage of the "Long Arm Statute" was Article 23, Section 92 of the Annotated Code of Maryland (1967 Edition) which provided in Section 92(a)(2) that *every foreign corporation doing intrastate or interstate or foreign business in this State be subject* to suit in this State by a resident of this State or a person who has a usual place of business in this State, (1)—(2) on any cause of action arising outside of this State.

Article 23, Section 92 was repealed by Acts 1967, Ch. 532, Sec. 1—Thereby eliminating the right of a Maryland resident to sue a foreign corporation on

any cause of action arising outside of this State and restricting such suits as provided in Article 75, Section 96(a)(4) to tortious injury caused in this State.

Whereas, The elimination of Article 23, Section 92(a)(2) has caused an undue burden and hardship on Maryland residents who sustain tortious injury outside of the State of Maryland by acts or omissions caused outside the State by corporations or their agents *regularly doing business in Maryland* by requiring Maryland residents to obtain redress of such tortious injury outside of the State of Maryland.

Whereas, It is desirable to retain that portion of Article 23, Section 92(a)(2) and to make it a part of Article 75, Section 96(a)(4); now, therefore,

Section 1. *Be it enacted by the General Assembly of Maryland*, That Section 96(a) of Article 75 of the Annotated Code of Maryland (1969 Replacement Volume and 1970 Supplement), title "Pleadings, Practice and Process At Law," subtitle "Bases of Personal Jurisdiction Over Persons Outside this State," be and it is hereby repealed and re-enacted, with amendments, to read as follows: * * *. [Emphasis added.]

the Maryland statute. However, the United States Court of Appeals for the Fourth Circuit has recently construed those same words as they appear in Virginia's Long Arm Statute, Va.Code Ann. § 8–81.2 (1964). Ajax Realty Corporation v. J. F. Zook, Inc., No. 71–2145 (4th Cir. December 12, 1972).[13] In that case, a Washington State manufacturer of window frames sold $37,000 [14] worth of frames to an independent Colorado sales firm which in turn sold the frames to the Virginia user. At the request of the Colorado sales firm the Washington manufacturer shipped the frames F.O.B. directly to the purchaser in Virginia where they were installed, and subsequently proved themselves to be defective. Suit was instituted by the Virginia purchaser against the Washington State manufacturer in the Federal District Court for the Eastern District of Virginia, and service was effected upon the Secretary of State of Virginia pursuant to the Virginia Long Arm Statute.

In response to the contention that the $37,000 contract price represented only one-half of one percent of the manufacturer's total sales, and thus could not be deemed to have produced "substantial revenues", Judge Winter wrote:

 \* \* \* Although percentage of total sales may be a factor to be considered, it cannot be dispositive, for a small percentage of the sales of a corporate giant may indeed prove substantial in an absolute sense.[5] On the other hand, it is difficult to identify an absolute amount which *ipso facto* must be deemed "substantial."

> 5. Conversely, a relatively small absolute amount might be deemed "substantial" where it constitutes a significant percentage of a small corporation's total sales.

Further, Judge Winter noted the existence of "a trend toward liberal construction of 'substantial revenue' provisions" citing 51 Va.L.Rev. at 749, and held "[w]ithout purporting to draw a hard and fast line" that $37,000 was, in fact, substantial revenue.

Plaintiff contends herein that Orinoco derives substantial revenue from the use or consumption of iron ore in Maryland in three ways: (1) finished steel products made from the iron ore are used in Maryland; (2) iron ore is stored in Maryland while in transit to steel plants in other states; and (3) iron ore sold by Orinoco to Bethlehem Steel has been processed in the past at Sparrows Point in Baltimore. As to the first two of those three sources of revenue, their nexus with Maryland is most attentuated. While courts have held that the original manufacturer of a product, which has passed through several distributors and retailers, can be brought within the personal jurisdiction of a state or federal court under the terms of a state long arm statute similar to that of Maryland's article 75, § 96(a)(4) when the product causes injury in the

---

13. In relevant part that Virginia statute provides:

 § 8–81.2 When personal jurisdiction over person may be exercised.

 (a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's

 \* \* \* \* \*

 (4) Causing tortious injury in this State by an act or omission outside this State if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this State;

 (5) Causing injury in this State to any person by breach of warranty expressly or impliedly made in the sale of goods outside this State when he might reasonably have expected such person to use, consume, or be affected by the goods in this State, provided that he also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State; . . . .

14. The $37,000 shipment into Virginia constituted the manufacturer's sole contact with Virginia.

forum state,[15] those cases would not appear to control here. First, there is an obvious difference, in the context of "deriving substantial revenue", between the sale of a finished manufactured product and the sale of a raw material such as iron ore which ends up being a component part of a finished manufactured product sold by a seller who has no identity with the seller of the ore. Thus, while the cases cited in n.15 *supra* recognize the common sense proposition that a manufacturer may reasonably expect, and can be expected, to account to those who are injured by the product it manufactured, those cases do not suggest that the seller of raw material should be accountable in the courts of every jurisdiction in which such raw material may eventually, as part of a finished product, appear. Secondly, even assuming that temporary storage in Maryland of iron ore previously sold by Orinoco can be considered to be use or consumption of goods in Maryland, there is no relationship between that storage and the revenues derived by Orinoco from the sale of such ore. Rather, keeping in mind that title to the iron ore passes from Orinoco to U. S. Steel in Venezuela, and is originally destined for Pennsylvania and not Maryland, Orinoco derives substantial revenue from the sale of ore to customers in Pennsylvania *despite* the fact that some of that ore is temporarily deposited in Maryland. There is thus little or no basis for believing that the Maryland legislature intended by the 1971 amendment to found personal jurisdiction upon the activities above referred to. That conclusion obviates the necessity of determining whether such an attempted exercise of jurisdiction could meet the due process standards of International Shoe v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny.

There remains for consideration the fact that Orinoco has in the past sometimes sold raw iron ore not only to a subsidiary of U. S. Steel but also to a subsidiary of Bethlehem Steel and that the latter subsidiary has then shipped Orinoco's ore to Bethlehem Steel's plant at Sparrows Point in Maryland. It would not seem overly to strain the words of the Maryland statute to conclude that Orinoco has derived "substantial revenue" from iron ore used or consumed in Maryland by Bethlehem Steel. Accordingly, if Orinoco's negligent handling or processing of any such iron ore had caused injury to a plaintiff in Maryland, the statute's language might well require Orinoco to appear in this Court to defend against such a claim, at least under the reasoning of Lamprecht v. Piper Aircraft Corp., 262 Md. 126, 277 A.2d 272 (1971). *See also* Ajax Realty Corporation v. J. F. Zook, *supra;* Liberty Mutual Ins. Co. v. American Pecco Corp., 334 F.Supp. 522 (D.D.C. 1971).[16] Nor would such a requirement appear to impose any undue constitutional burden. But in the present case, the ore aboard the Sorrento was neither mined nor sold by Orinoco to anyone. Rather, that ore was mined by a Bethlehem Steel subsidiary and shipped by that subsidiary aboard a ship owned by plaintiff. Indeed, all that plaintiff alleges Orinoco did, in connection with the shipment of the ore aboard the Sorrento, is that Orinoco negligently maintained or failed to maintain a river channel in Venezuela, and negligently cleared the Sorrento for passage down that channel. Nor has the plaintiff, which has the

15. *See* Liberty Mutual Ins. Co. v. American Pecco Corp., 334 F.Supp. 522 (D. D.C.1971); Lamprecht v. Piper Aircraft Corp., 262 Md. 126, 277 A.2d 272 (1971). In Liberty Mutual Ins. Co. v. American Pecco Corp., *supra*, a German manufacturer of a crane was held subject to service of process under the District of Columbia Long Arm Statute. In that case, the crane had been sold to a distributor, a New York corporation, F.O.B. Hamburg, Germany, and then leased by the New York distributor to a construction firm in Washington, D. C. for use in the District. The crane collapsed in the District of Columbia and caused injury therein to plaintiff. The words of the applicable D. C. statute were almost identical with those in section 96(a)(4). The Court held that personal jurisdiction was present.

16. *See* n. 15 *supra.*

burden of proof with regard to establishing all facts upon which *in personam* jurisdiction is based,[17] established that Bethlehem Steel's operations in Maryland were in any way injured or for that matter affected, adversely or otherwise, by the 12-day delay in the arrival of the iron ore shipped aboard the Sorrento or by the fact that after such delay only 44,441 long tons of such ore, rather than 52,999, arrived in Maryland. The record discloses that Bethlehem Steel maintained a stock pile of from ·100,000 to 3,000,000 long tons of iron ore at all times relevant herein. The record does not disclose the exact size of the stock pile in December, 1969. Further, there is a complete absence of evidence concerning whether Bethlehem Steel took any steps whatsoever in terms of operations at its Sparrows Point plant in Maryland or in terms of purchasing, because of the incident complained of by plaintiff in this case.

In Ratliff v. Cooper Laboratories, 444 F.2d 745, 748 (4th Cir.), cert. denied, 404 U.S. 948, 92 S.Ct. 271, 30 L.Ed.2d 265 reh. denied, 404 U.S. 1006, 92 S.Ct. 561, 30 L.Ed.2d 559 (1971). Judge Craven wrote: "If 'plaintiff's injury does not arise out of something done in the forum state, then other contacts between the corporation and the state must be *fairly extensive* before the burden of defending a suit therein may be imposed upon it without offending "traditional notions of fair play and substantial justice." ' F. James, Civil Procedure 640 (1965). See Hanson v. Denckla, *supra*, 357 U.S. at 251, 78 S.Ct. 1228 [2 L.Ed.2d 1283] ; Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952) ; Volkswagen Interamericana, S. A. v. Rohlsen, 360 F.2d 437 (1st Cir. 1966) ; von Mehren and Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1137–38, 1142–44 (1966)." (Emphasis added by Judge Craven). In *Ratliff*, the Fourth Circuit rejected the contention that there was present *in personam* jurisdiction under the South Carolina Long Arm Statute over two drug companies whose products were neither manufactured in South Carolina nor caused injury to consumers in that State. The "contacts, ties or relations" held insufficient in *Ratliff* to satisfy the due process clause of the Fourteenth Amendment consisted of, in the case of one of the defendant companies, application for and receipt of authority to do business in South Carolina, the appointment of a resident agent for service of process in South Carolina, and the presence of "detail men" in that State to promote company's products and occasionally to take orders. The other defendant company's activities were limited to solicitation by mail to dealers, wholesalers and doctors. In the present case, Orinoco's contacts with Maryland are certainly not as extensive as those held to be constitutionally insufficient in *Ratliff*.

 Upon the facts of this case and in the light of *Ajax*, there is a substantial question as to whether Orinoco has derived "substantial revenue" pursuant to section 96(a)(4). And in the light of *Ratliff*, there is a substantial question as to whether, even if Orinoco so derived "substantial revenue", the contacts with Maryland are sufficient particularly since no injury in Maryland seemingly occurred. But those questions need not be answered herein because of the meaning of section 96(b) and its interrelationship with 96(a) including subsection (4) of the latter.

Subsection (b) of section 96 provides:

When jurisdiction over a person is based solely upon this section, only *a cause of action arising from acts enumerated* in this section may be asserted against him. [Emphasis added.]

The purpose of that subsection, substantially lifted from the Uniform Interstate

---

17. Topik v. Catalyst Research Corporation, 339 F.Supp. 1102, 1105 (D.Md. 1972), relying, *inter alia*, upon McNutt v. General Motors Acceptance Corpora-

tion, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1133 (1936) ; Bowman v. White, 388 F.2d 756 (4th Cir. 1968).

and International Procedure Act, was examined in Malinow v. Eberly, 322 F. Supp. 594 (D.Md.1971).[18] In that case, Judge Miller noted (at 599):

> * * * The drafters of the forbear of the Maryland statute logically would not view the precursor of § 96(b) as requiring that all elements of a cause of action arise in the forum state, but, in harmony with the concept expressed in the above note, would probably state that § 96(b) merely prevents the assertion of claims in the forum state that do not bear some relationship to the acts in the forum state relied upon to confer jurisdiction. The conclusion comports with the reasoning of the Supreme Court in the cases which established the jurisdictional limits which the Uniform Act sought to fill. In *International Shoe, supra,* 326 U.S. at page 317, 66 S.Ct. at page 159, the Court states that the conduct by a corporate agent of isolated acts in a state is insufficient to subject the corporation " * * * to suit *on causes of action unconnected* with the activities there."
> * * *

The Maryland courts have held that it is not necessary that all elements of a cause of action be founded on acts which have taken place within the State of Maryland under the "transacting any business" test so long as there is a showing of some purposeful acts performed by the defendant in Maryland in relation to one or more of the elements of the cause of action. * * * Similar conclusions have been reached by other courts. * * * [Emphasis in original.]

In *Malinow,* an accounting was sought. Analyzing the elements of that cause of action, Judge Miller held that at least two of the four essential elements were founded upon the asserted long-arm statute jurisdictional base, i.

e., transacting business under section 96(a)(1). In the case at bar, none of the elements of the alleged negligence of Orinoco are in any way founded upon or connected with the derivation by Orinoco of any revenue, substantial or otherwise, from any goods, services or manufactured products used or consumed in Maryland. The claim herein is not a claim arising out of defective ore, *cf. Ajax,* nor is it an action which in any way concerns the use or misuse of the ore. Rather, this action concerns alleged torts committed with regard to maintenance and use of a river channel in Venezuela. Section 96(a)(4) deals solely with "tortious injury". In this case, no one in Maryland has asserted a tortious act by Orinoco in violation of any duty owed to any one in Maryland, including Bethlehem Steel. The sole assertion of tortious acts is by an Italian shipowner concerning damages relating to its ship while the latter was in Venezuelan waters. The fact that the ore was mined in and shipped from Venezuela by a Bethlehem Steel subsidiary, and was in the process of shipment to Bethlehem Steel in Maryland when the accident complained of in this case occurred, was a happenstance which is totally unrelated to any of the elements of the cause of action for tortious injury to plaintiff's ship caused by negligence on the part of Orinoco in maintaining or failing to maintain, or clearing the Sorrento for passage down, the river channel. Upon such an unrelated happenstance, section 96(b) makes it clear that Maryland long-arm jurisdiction under section 96(a)(4) may not rest. Thus, once again, the constitutionality of such coverage need not be determined.

Finally, if *in personam* jurisdiction over the defendant were present herein, there would remain a substantial question as to whether this Court should exercise its discretion and refuse to assert that jurisdiction. The alleged negli-

---

18. In *Malinow* (at 599), Judge Miller quoted, *inter alia,* the following sentence from 9B Uniform Laws Annotated 313 in reference to the Uniform Act's counterpart to section 96(b):

> * * * Subdivision (b) is designed to prevent assertion of independent claims *unrelated to any activity described* in subdivision (a) of § 1.03. [Emphasis supplied by Judge Miller.]

gence took place in Venezuela. Thus, presumably, Venezuelan law will apply with regard to the alleged tortious acts. In addition, most of the physical evidence and the witnesses will probably be located in or hail from Venezuela. Whether defendant Orinoco, a Delaware corporation, could successfully persuade a federal court not to exercise jurisdiction in a suit like this one [19] is a question which need not be determined in this case in the light of this Court's holding concerning lack of coverage of section 96(a)(4) over defendant Orinoco.

For the reasons set forth in this opinion, this Court holds that there is absent in this case personal jurisdiction over Orinoco Mining Company. Defendant's motion to dismiss is therefore hereby granted.

---

19. *See* 4 Wright and Miller, Federal Practice and Procedure § 1069 at 255 (1969). *Cf.* Lekkas v. Liberian M/V CALEDONIA, 443 F.2d 10 (1971) ; Giatilis v. The Steam Tanker DARNIE, 171 F.Supp.

751 (D.Md.1959). *But, cf.* Mobil Tankers Co. v. Mene Grande Oil Co., 363 F.2d 611, 614 (3d Cir.), cert. denied 385 U.S. 945, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966).